**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FIRESTAR DIAMOND, INC., *et al.*<br><br>Debtors. | Chapter 11<br><br>No. 18-10509 (SHL)<br><br>(Jointly Administered) |
| RICHARD LEVIN, Liquidating Trustee of the FIRESTAR DIAMOND LIQUIDATING TRUST and the OLD AJ LIQUIDATING TRUST,<br><br>Plaintiffs,<br>v.<br><br>ANTHONY ALLICOCK and ROCHELLE MILLER,<br><br>Defendants. | Adv. Proc. No. |

## COMPLAINT

Plaintiff Richard Levin, not individually but solely as Liquidating Trustee ("**Liquidating Trustee**" or "**Plaintiff**") of the Firestar Diamond Liquidating Trust and the Old AJ Liquidating Trust (the "**Liquidating Trusts**") and as holder of a joint and several judgment against, and as assignee of all claims and causes of action owned by the non-debtor U.S. affiliates of the Debtors, Nirav Modi, Inc. f.k.a. Firestar Jewelry, Inc. ("**NMI**"), Firestar Diamond International, Inc. ("**FDII**"), Synergies Corporation ("**Synergies**"), Firestar Group, Inc. ("**FGI**"), AVD Trading, Inc. ("**AVD**") (together, the "**U.S. Affiliates**"), for his Complaint alleges as follows:

## NATURE OF THE ACTION

The Liquidating Trustee brings this action as successor to the Chapter 11 Trustee, as defined below, comprised of claims and causes of action assigned to the Chapter 11 Trustee by the Debtors' U.S. Affiliates, against Defendants Anthony Allicock ("**Allicock**") and Rochelle Miller ("**Miller**"). By this action, the Liquidating Trustee seeks to recover millions of dollars owed to the U.S. Affiliates because of the diversion of substantially all of the U.S. Affiliates' assets to entities owned by or controlled by Nirav Modi and other co-conspirators involved with the Debtors while the US Affiliates were being overseen and led by Allicock and Miller. The Defendants were responsible for the diversion of substantially all the U.S. Affiliates' assets for what Defendants knew or should have known was less than reasonably equivalent value. Given the Defendants roles at the U.S. Affiliates, the Defendants knew or should have known that the result of their actions would lead to the insolvency and collapse of the U.S. Affiliates. These actions by the Defendants were a breach of their fiduciary duties to the U.S. Affiliates. Defendants were also faithless servants who should have all payments made to them by the U.S. Affiliates during Defendants' employment disgorged.

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for Southern District of New York (the "Court") has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) because this adversary proceeding arises under title 11 of the United States Code and arises in and is related to these chapter 11 cases.

2. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(O) which this Court has authority to hear, by reason of the District Court's referral under 28 U.S.C. § 157(a) and under General Order M-431 (Amended Standing

2

Order of Reference), and to hear and determine and enter judgment.

3. Venue of this adversary proceeding is proper in this district under 28 U.S.C. § 1409.

4. To the extent that this Court does not have authority to determine the claims asserted in this adversary proceeding and to enter final judgment thereon, the Liquidating Trustee consents to the issuance and entry of a final judgment or order by this Court.

## THE PARTIES AND OTHER RELEVANT ENTITIES

5. Plaintiff Richard Levin was the chapter 11 trustee (the "**Chapter 11 Trustee)** for Firestar Diamond, Inc. (f/k/a Firestone, Inc.) ("**FDI**"), Fantasy, Inc. ("**Fantasy**") and Old AJ, Inc. (f/k/a A. Jaffe, Inc., f/k/a Sandberg & Sikorski Corp.) ("**Old AJ**") (together, the (**"Debtors"**), duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for Region 2 on June 14, 2018, whose appointment was approved by this Court by order entered that same day.

6. On November 20, 2019, the Court confirmed the Debtors' joint chapter 11 plan of liquidation, which provided for the creation of liquidating trusts for each of the Debtors' estates and the transfer of all of the Debtors' assets to such trusts, including the Debtors' causes of action. The Debtors' plan became effective on August 3, 2020 and Richard Levin was appointed on that date as liquidating trustee for each of Liquidating Trusts. The Liquidating Trustee brings this action not individually but solely in his capacity as Liquidating Trustee.

*The Defendants*

7. On or about March 18, 2018, after the Debtors bankruptcy filing but before the appointment of the Chapter 11 Trustee, Nehal Modi and Mihir Bhansali orchestrated the appointment of Allicock as the sole director of Firestar Holdings Limited (**"FHL"**),

3

Nirav Modi Ltd. ("**NML**"), and Firestar Diamond Ltd. ("**FDL**"), all Hong Kong corporations. On or about April 5, 2018, Allicock was appointed the President and sole director of each of the U.S. Affiliates. As the sole director of FHL and the sole director and president of the U.S. Affiliates, Allicock transacted business in New York State, including the transactions at issue in this Adversary Proceeding. Upon information and belief, Mr. Allicock is a resident of New Jersey.

8. On or about June 1, 2018, Allicock appointed Defendant Miller to serve as the sole director and CEO of each of the U.S. Affiliates. As the sole director and CEO of the U.S. Affiliates, Miller transacted business in New York State, including the transactions at issue in this Adversary Proceeding.

**The Debtors**

9. Debtor Firestar Diamond, Inc. (f/k/a Firestone, Inc.) is a privately-held, Delaware corporation with its principal place of business in New York. While in operation, FDI principally operated a wholesale jewelry business.

10. Debtor Fantasy, Inc. is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, Fantasy was principally a wholesalejewelry business. FDI owns 100% of the equity interests in Fantasy.

11. Debtor Old AJ, Inc. (f/k/a A. Jaffe, Inc., f/k/a Sandberg & Sikorski Corp.) is a privately-held New York corporation, with its principal place of business in New York. While in operation, Old AJ was principally a wholesale bridal jewelry business.

**The Debtors' Foreign Affiliates**

12. NML owns 100% of the equity interests in NMI. Upon information and belief, NML is the principal holding company for subsidiaries operating *Nirav Modi*-branded boutiques around the globe.

13. FDL was a wholesaler of jewelry, precious stones and related items.

14. FHL owns 100% of the equity interests in NML, as well as in FDII, Synergies, FGI and ADV.

15. Firestar International Limited (f/k/a Firestar International Private Limited) ("**FIL**"), an India company, holds 100% of the equity interests of FHL. As a result, FIL is the ultimate holding company of the U.S. Affiliates, as well as numerous other Firestar entities, including the Debtors.

*The Debtors' U.S. Affiliates*

16. The U.S. Affiliates did not file for bankruptcy. They are Delaware corporations that operated in New York. On January 15, 2020, the Chapter 11 Trustee and the U.S. Affiliates entered into a settlement agreement under which the U.S. Affiliates assigned to the Chapter 11 Trustee any and all claims or causes of action then-owned or subsequently acquired by the U.S. Affiliates, and consented to entry of judgment in favor of the Chapter 11 Trustee, jointly and severally, against the U.S. Affiliates in the amount of $23,116,505.44. (*See In Re: Firestar Diamond, Inc., et al.* Case No. 18-10509 (Bankr. SDNY), Dkt. 1366). Judgment in that amount was entered on February 18, 2020. (*See* Case Adv. No.20-01014 Bankr. SDNY), Dkt. 3). The Liquidating Trustee is successor in interest to the Chapter 11 Trustee's claims and rights.

17. At all times relevant to the transactions at issue in this complaint, FDII, Synergies and ADV were wholly owned by FHL and NMI was wholly owned by NML, which in turn was owned by FHL.

## BACKGROUND

18. This case arises from the fraudulent scheme conducted by Nirav Modi with assistance from family and others that led to the Debtors' bankruptcy filing. At the time of the

bankruptcy filing, the U.S. Affiliates had inventory of jewelry and diamonds valued at approximately $40 million (the **"Inventory"**), as well as over $1 million in cash (the **"Cash"**).

19. The bankruptcy was the result of a massive fraud undertaken by Nirav Deepak Modi ("Nirav Modi") who operated a retail luxury, wholesale, and manufacturing diamond business that defrauded an Indian bank out of hundreds of millions of dollars.

20. Upon information and belief, the U.S. Affiliates were kept out of bankruptcy to keep the Inventory and Cash from the bankruptcy estate, and to allow the transfer of the Inventory and Cash out of the United States to NML and other entities and persons affiliated with the fraudulent scheme that led to the bankruptcy.

21. At all times relevant to this complaint, NMI operated boutiques in Las Vegas, Honolulu, Los Angeles, and New York (the **"NMI Boutiques"**). The NMI Boutiques shipped substantially all of their inventory valued at approximately $40 million to New York where it was held in storage by Malca-Amit, a company that provides vaulting facilities and shipping services for the diamond and jewelry industry, among others. The Inventory was stored at Malca-Amit because its value exceeded the amount of available insurance coverage on items stored in the Debtors' vault.

***Defendant Allicock***

22. After the Debtors' bankruptcy filing, Allicock was initially hired by Nehal Modi (Nirav Modi's brother) and Mihir Bhansali (the CEO and sole Director of the Debtors) to wind down the non-debtor foreign Hong Kong Firestar entities. On March 19, 2018, Allicock was appointed the sole director of FHL, and for a short time the President and sole director of the U.S. Affiliates. Prior to his role with FHL and later the U.S. Affiliates, Allicock worked in the diamond industry as a store manager. It appears that his primary qualification for the jobs for which he was hired was that he was Nehal

Modi's friend, as he had no experience with insolvency, finance, or wind-down of a business.

23.    On March 23, 2018, Mihir Bhansali, the sole director of the U.S. Affiliates at the time, appointed Jacen Dinoff and Michael Goldman of KCP Advisory Group, two experienced restructuring specialists, as directors and President and Chief Financial Officer, respectively, of each of the U.S. Affiliates.

24.    On or about April 5, 2018, Angela Ypma (**"Ypma"**), the global director of the Nirav Modi brand, instructed Dinoff and Goldman to send her a detailed inventory of NMI inventory in New York and stated, "We need to ship all products to HK." Goldman replied, "we are NOT shipping anything right now. I will let you know when it is okay to do this."

25.    Upon information and belief, Dinoff and Goldman refused to ship any of the Inventory to Hong Kong because there appeared to be no legitimate basis for doing so and that the purpose of the transfer was to divert assets out of the country before satisfaction of the U.S. Affiliates' obligations.

26.    Upon information and belief, because Dinoff and Goldman refused to ship any of the Inventory to Hong Kong, Allicock terminated Dinoff and Goldman and sent the following email, "In my capacity as Director of Firestar Holdings Limited, I am relieving you of your duties and directorship of the New York subsidiaries effective immediately. Please confirm in writing your acceptance of the same."

27.    Upon information and belief, the U.S. Affiliates were not indebted to any of the affiliates in Hong Kong, and the Hong Kong affiliates were not going to provide the U.S. Affiliates reasonably equivalent value for the transfers.

28.    On April 5, 2018, after terminating Dinoff and Goldman because they would not transfer the inventory to Hong Kong, Allicock appointed himself sole director and president

7

of each of the U.S. Affiliates.

29. On April 6, 2018, Allicock authorized the shipment of $6,804,210.49 of FDII inventory to FDL in Hong Kong. Upon information and belief, this shipment involved the diamonds Dinoff and Goldman refused to ship before Allicock terminated them.

30. Upon information and belief, Allicock knew or should have known the diamonds sent to FDL were improper transfers and that FDII did not receive reasonably equivalent value for the transfers.

31. On April 13, 2018, Allicock, as the sole director of FHL, appointed Mark Motes the sole director and president, and Eddy Friedfeld the chief liquidation officer, of each of the U.S. Affiliates. Mark Motes, the former chief operating officer of Maryland-based Smyth Jewelers, was a diamond industry veteran. Eddy Friedfeld was a turnaround consultant who had managed Diamlink's out-of-court restructuring in 2015 and 2016.

32. Upon information and belief, despite the appointments of Motes and Friedfeld, Allicock continued to control the U.S. Affiliates, and therefore, acted as their de facto officer and director.

33. As a result, Allicock continued to loot NMI's inventory by effectuating the following transfers.

    (i) On April 25, 2018, NMI shipped 45 pieces of inventory with a total declared value of $6,315,615 to NML in Hong Kong.

    (ii) On April 30, 2018, NMI shipped 93 pieces of inventory with a total declared value of $13,108,072 to NML in Hong Kong.

    (iii) On May 9, 2018, inventory with a declared value of $2,700,000 was shipped to Fancy Creations in Hong Kong. (The Malca-Amit

8

        documentation listed FDII as the shipper, but this shipment might have involved NMI inventory as well.)

    (iv)  On May 15, 2018, 122 pieces of NMI inventory with a declared value of $2,516,470.79 were shipped to NML.

34. On May 23, 2018, NML "sold" the 122 pieces of NMI inventory involved in the May 15 shipment to FDL. That same day, FDL "sold" the same pieces to Sino Traders Ltd., one of the Hong Kong-based "shadow entities" Nirav Modi and his co-conspirators used to perpetuate the bank fraud . Anthony Allicock signed the invoices for both of these purported sales. Yet, on June 19, 2018, Allicock told attorneys for the Hong Kong Firestar Entities that the May 15 shipment was sent from New York without Allicock's authorization and asked them to attempt to locate the shipment.

35. Throughout May 2018, Allicock pressured Eddy Friedfeld and Mark Motes to ship the remaining NMI and FDII inventory to Hong Kong. They refused to do so until all of the U.S. Affiliates' creditors were paid. When Friedfeld and Motes discovered the May 15, 2018 shipment, they demanded that Allicock arrange for the return of the shipment. Allicock refused.

36. Moreover, upon information and belief, the U.S. Affiliates did not receive reasonably equivalent value for any of the transactions.

*Defendant Miller*

37. On June 1, 2018, Allicock terminated Friedfeld and Motes due to their refusal to ship the U.S. Affiliates inventory to Hong Kong. Allicock then appointed Miller, another personal friend of Nehal Modi, as CEO and sole director of each U.S. Affiliate. Prior to her appointment, Miller worked as an event planner and had no jewelry industry, insolvency,

9

management, or financial experience.

38. That same day, Allicock introduced Miller to Ypma. Allicock and Ypma instructed Miller to retrieve the NMI and FDII inventory from Malca-Amit and ship it to Hong Kong.

39. At the time of Miller's appointment, the U.S. Affiliates' bank accounts held a total of $1,283,454.05 in cash.

40. On or about June 2, 2018, Miller, acting in her capacity as director and CEO of NMI and with no knowledge of NMI's interests, directed Malca-Amit to ship to the foreign Firestar entities in Hong Kong two sets of NMI inventory: 1) 208 pieces with a declared value of $5,063,914.01; and (2) 53 pieces with a declared value of $2,846,545. Malca-Amit refused to do so until it could verify Miller's authority.

41. Thereafter, Malca-Amit verified Miller's authority. On September 5 and 7, 2018, Miller instructed Malca-Amit to ship the remaining NMI and FDII inventory to Independent Gemological Laboratories ("**IGL**").

42. Upon information and belief, Nehal Modi directed Miller to effectuate the transfer.

43. Upon information and belief, the inventory shipped to IGL consisted of eight parcels of NMI inventory with a total declared value of $7,910,459, and the remaining parcel contained the FDII inventory with a declared value of $3,200,000.

44. Upon information and belief, IGL was secretly owned by Mehul Choksi, the uncle of Nirav Modi who was the principal fraudster in the bankruptcy.

45. On October 2, 2018, IGL's president Curtis Lowrey advised Miller that IGL had completed its inspection and appraisal of the NMI and FDII inventory, which Lowrey described as "17 bags and trunks of merchandise." IGL appraised the NMI and FDII inventory

at a "scrap value" of approximately $1.5 million. Lowrey further noted that, "as this is a 'fire sale' . . . I made deeper discounts than would normally be customary in pricing a closeout inventory." Miller paid IGL a total of $81,943 from June 2018 to June 2019 from FDII's and Synergies' bank accounts.

46. Upon information and belief, IGL intentionally undervalued the inventory.

47. Miller then purported to sell the NMI and FDII inventory to the "highest bidders" for a total purchase price of $1,593,550. It appears that most, and possibly all, of the purportedly arms-length purchasers were surrogates of Nirav Modi and his family.

48. For example, under an invoice October 4, 2018, Miller sold an unspecified quantity of "mixed jewelry" to Hong Kong-based Alchemist Global Trading & Consulting Ltd. ("**Alchemist**") for a total price of $420,300. Alchemist was formed on May 16, 2018 and is owned by Tamer Abou El Ata, who upon information and belief, is a personal friend of Nehal Modi.

49. Under an invoice dated October 8, 2018, Miller sold 296.56 carats of "loose diamonds" for $605,000 to Diamonds Village USA Corp., the California-based subsidiary of Dubai-based Diamonds Village DMCC. In July 2018, the owner of Diamonds Village, Naresh Mehta, was accused of running his own import-export scam using a *modus operandi* similar to Nirav Modi's scam. Firestar related entities' books and records reflect numerous transactions with Diamonds Village.

50. Moreover, upon information and belief, the U.S. Affiliates did not receive reasonably equivalent value for any of the transactions.

51. In total, over $40 million in diamonds and jewelry were shipped from the U.S. Affiliates to NML, FDL or other surrogates of Nirav Modi under Allicock and Miller's watch.

11

Upon information and belief, the U.S. Affiliates received nothing in return for the vast majority of the transfers.

*Funds Diverted for Miller's and Allicock's Self Interest*

52. On October 9, 2018, Miller paid herself a "one-time bonus" of $50,000 from FDII's bank account. On October 17, 2018, Miller wired $75,000 to Allicock from Synergies' bank account. These payments appear to be incentive compensation tied to Miller's "sale" of the FDII and NMI inventory.

53. Upon Information and belief, between June 2018 and June 2019, Miller received from the U.S. Affiliates a total of $1,522,781.46 in compensation, bonuses, expense reimbursements and expense payments on her behalf.

54. In addition to the $75,000 payment, Allicock also received from the U.S. Affiliates additional compensation of $100,000.

55. Miller spent the remainder of the U.S. Affiliates' funds on legal and financial advisors, taxes, office space leases, director & officer insurance premiums, and other miscellaneous expenses.

## CLAIMS FOR RELIEF

### COUNT 1

**Breach of Fiduciary Duty**
**(Anthony Allicock)**

56. Plaintiff restates and re-alleges paragraphs 1 through 55 of this Complaint as though fully set forth herein.

57. As the sole director of FHL, and president and sole director of the U.S. Affiliates, Allicock owed them a duty of loyalty and a duty to act in good faith.

58. Allicock hired and fired officers and directors of the U.S. Affiliates with the

purpose of authorizing and facilitating the transfer of millions of dollars of Inventory to related foreign entities. These transfers were made without the U.S. Affiliates receiving reasonably equivalent value.

59. At times, Allicock was also an officer and director of the U.S. Affiliates. While acting in such capacity, Allicock also authorized the transfer of millions of dollars of Inventory from the U.S. Affiliates to related foreign entities for less than reasonably equivalent value.

60. At the time of the transfers, Allicock knew, or should have known, that the transfers were improper and for less than reasonably equivalent value, and he made no attempt to verify such transfers were reasonable and a proper use of the U.S. Affiliates' inventory.

61. Allicock's unreasonable actions, his failure to consider the risks of transferring all the Inventory out of the country and its effect on the U.S. Affiliates' business, his failure to show loyalty to the U.S. Affiliates by making such transfers, and his failure to act with good faith on behalf of the U.S. Affiliates constitute a breach his fiduciary duty to the U. S. Affiliates.

62. By reason of the foregoing, Plaintiff, as the assignee of all claims and causes of action of the U.S. Affiliates, is entitled to judgement against Allicock for the value of the Inventory shipped as a result of Allicock's breach of his fiduciary duty to the U.S. Affiliates.

## COUNT 2

**Faithless Servant**
**(Anthony Allicock)**

63. Plaintiff restates and re-alleges paragraphs 1 through 62 of this Complaint as though fully set forth herein.

64. The facts establish that for the entirety of his relationship with the U.S. Affiliates,

13

Allicock showed no concern for their financial well-being, including the firing of officers and directors that attempted to preserve the Inventory for the U.S. Affiliates.

65. By knowingly and purposefully allowing the transfer of the Inventory without adequate consideration, Allicock acted in a manner that was inconsistent with his duties to the U.S. Affiliates.

66. The facts also establish that this pattern of disloyalty was persistent in that it occurred during the entirety of Allicock's employment.

67. By reason of the foregoing, Plaintiff, as the assignee of all claims and causes of action of the U.S. Affiliates, is entitled to disgorgement of all compensation paid to Allicock by the U.S. Affiliates.

## COUNT 3

### Breach of Fiduciary Duty
### (Rochelle Miller)

68. Plaintiff restates and re-alleges paragraphs 1 through 67 of this Complaint as though fully set forth herein.

69. While employed by the U.S. Affiliates, Miller was the CEO and sole director. While acting in such capacity, Miller authorized the transfer of millions of dollars of Inventory from the U.S. Affiliates to related foreign entities for less than reasonably equivalent value.

70. As the sole director and CEO of the U.S. Affiliates, Miller owed them a duty of loyalty and a duty to act in good faith.

71. At the time of the transfers, Miller knew, or should have known, that the transfers were improper and for less than reasonably equivalent value, and she made no attempt to verify such transfers were reasonable and a proper use of the U.S. Affiliates' inventory.

72. Miller's unreasonable actions, her failure to consider the risks of transferring all the Inventory out of the country and its effect on the U.S. Affiliates' business, her failure to show loyalty to the U.S. Affiliates by making such transfers, and her failure to act with good faith on behalf of the U.S. Affiliates constitute a breach her fiduciary duty to the U. S. Affiliates.

73. By reason of the foregoing, Plaintiff, as the assignee of all claims and causes of action of the U.S. Affiliates, is entitled to judgement against Miller for the value of the Inventory shipped as a result of Miller's breach of fiduciary duty to the U.S. Affiliates.

## COUNT 4

### Faithless Servant
### (Rochelle Miller)

74. Plaintiff restates and re-alleges paragraphs 1 through 73 of this Complaint as though fully set forth herein.

75. The facts establish that for the entirety of her relationship with the U.S. Affiliates, Miller showed no concern for their financial well-being while shipping the remaining inventory overseas and burning through over $1 million of cash.

76. By knowingly and purposefully allowing the transfer of the Inventory without adequate consideration, Miller acted in a manner that was inconsistent with her duties to the U.S. Affiliates.

77. The facts also establish that this pattern of disloyalty was persistent in that it occurred during the entirety of Miller's employment.

78. By reason of the foregoing, Plaintiff, as the assignee of all claims and causes of action of the U.S. Affiliates, is entitled to disgorgement of all compensation paid to Miller by the U.S. Affiliates.

**WHEREFORE**, Plaintiff, as the assignee of claims held by the U.S. Affiliates, respectfully requests that the Court ender judgement:

a. On Count 1, in favor of Plaintiff and against Allicock, an amount of damages to be proven at trial, but no less than $40,000,000, that was suffered by the U.S. Affiliates as a result of Allicock's breach of fiduciary duty.

b. On Count 2, in favor of Plaintiff and against Allicock disgorging payments to Allicock in the amount of $175,000.

c. On Count 3, in favor of Plaintiff and against Miller, an amount of damages to be proven at trial, but no less than $11,000,000, that was suffered by the U.S. Affiliates as a result of Miller's breach of fiduciary duty.

d. On Count 4, in favor of Plaintiff and against Miller disgorging payments to Miller in the amount of $1,522,781,46.

e. Award Plaintiff interest, costs, and attorney's fees, and such other equitable relief as may be just and proper.

Dated: June 1, 2021
New York, New York

Respectfully submitted,

**SARACHEK LAW FIRM**

 /s/ Joseph E. Sarachek
Joseph E. Sarachek
Jonathan H. Miller
670 White Plains Rd, PH Floor
Scarsdale, NY 10178
Telephone: (646) 517-5420
Facsimile: (646) 861-4950
joe@saracheklawfirm.com
jon@saracheklawfirm.com

*Attorneys for Richard Levin as Liquidating Trustee of the Firestar Diamond Liquidating Trust and the Old AJ Liquidating Trust*

16